IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**MONTEZ L. FULLER,**<br><br>**Defendant.** | **Case No. 3:26-CR-30096-NJR** |

# MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

Pending before the Court are three motions filed by Defendant Montez Fuller: a Motion to Dismiss Indictment as Sanction (Doc. 26), a Motion to Suppress Evidence Due to a [sic] Unlawful Search and Seizure (Doc. 27), and a Motion to Dismiss Indictment for Vindictive Prosecution (Doc. 28). The Government timely filed its responses in opposition (Docs. 31, 32, 34), and Fuller thereafter filed a reply to Doc. 32 only (Doc. 37). The Court addresses the three motions together, organizing its analysis by claim.

## Background

Early in the morning of May 12, 2026, two women—a mother and a daughter—called 911. (Doc. 35, Ex. 7). They were driving to the mother's workplace when a man in a black car intercepted them and fired multiple rounds at their vehicle. (*Id*. at Ex. 7, 2:00). The women hurried to the workplace, parked, and ran inside. (*Id*. at Ex. 4, 00:06). Moments later, the black car pulled up, and its driver pointed a gun through the vehicle's open window at the fleeing women. (*Id*. at Ex. 4, 00:18; Ex. 9, 19:40). When the driver

spotted nearby witnesses, he reassured them, "y'all good, y'all good, I'ma kill them bitches." (*Id*. at Ex. 9, 19:35). He then drove away. (*Id*. at Ex. 4, 00:27).

When asked by the 911 operator, the women immediately identified the shooter as Montez Fuller, the mother's ex-boyfriend. (*Id*. at Ex. 7, 1:49, 2:51). The victims explained to Granite City Police Department ("GCPD") officers at the scene that Fuller had been threatening the mother, who allegedly owed him money. According to the victims, Fuller would sit drunk outside her home saying he would "shoot the house up" and send her threatening text messages. (*Id*. at Ex. 8, 9:25). The victims showed these messages to the officers. (*Id*. at Ex. 9, 14:10).

The GCPD officers then interviewed witnesses at the scene. One witness identified the shooter as a Black man with a "big gun." (*Id*. at Ex. 9, 21:18, 19:56). Another offered a picture she had taken of the black car, a Lincoln with a license plate reading FH84721. (*Id*. at Ex. 9, 5:39).

The GCPD broadcast an Illinois State Police Emergency Radio Network ("ISPERN") notice to nearby law enforcement agencies. (*Id*. at Ex. 9, 13:10; Ex. 13, 12:43). The notice stated that GCPD was searching for Fuller and included the make, model, and license plate of Fuller's car. (*Id*. at Ex. 9, 13:10).

Around 9:09 a.m., Illinois State Police ("ISP") Trooper Whalen was investigating a traffic crash on I-70 EB when he spotted a black Lincoln with a license plate beginning with the letter 'F.' (*Id*. at Ex. 12, p. 2). Recalling the ISPERN notice, he followed the car and positively identified it as the one GCPD was searching for. (*Id*.). Trooper Whalen requested assistance but continued following Fuller's vehicle until it stopped at a Mini

Mart. (*Id*. at Doc. 13, 34:13). Three East St. Louis Police Department ("ESLPD") officers pulled up behind Fuller's vehicle and Trooper Whalen positioned his car to block the exit. (*Id*. at Ex. 12, p. 2). The ESLPD officers then approached Fuller, handcuffed him, and searched his person for weapons; during this search, Fuller told the officers, "that shit in the car." (*Id*. at Ex. 13, 00:00-00:15).

Accordingly, the ESLPD officers searched the vehicle and discovered two firearms. (*Id*. at Ex. 14, 2:35, 3:48). ISP Trooper Whalen took Fuller into custody until GCPD arrived at the scene. (*Id*. at Ex. 12, p. 3). Fuller was then transferred to GCPD's custody. (*Id*.).

On July 21, 2026, a federal grand jury charged Fuller with being a felon in possession of a firearm.[1] (Doc. 1). His charge is subject to enhanced penalties under 18 U.S.C. § 924(e)(2) based on several prior convictions, including two counts of bank robbery. (*Id*.).

On September 10, 11, and 14, Fuller, who has chosen to proceed *pro se*, filed the present motions.

## Discussion

### I. Police Report

Fuller claims that the Government failed to produce a police report from the ESLPD in violation of the Court's discovery orders, Rule 16 of the Federal Rules of Criminal Procedure, and its obligations under *Brady v. Maryland*, 373 U.S. 83 (1963). (Doc. 26, pp. 1-4). He asserts that without this report, he cannot identify the officers

---

[1] A superseding indictment was returned on August 18, 2026 (Doc. 16), but the charge remains the same.

involved in his arrest or the facts establishing probable cause and, therefore, he cannot bring the appropriate legal challenges.[2] (*Id*. at 6). He concludes that the Court should dismiss his indictment and suppress all statements made during his arrest, the body-worn camera ("BWC") footage, the testimony by arresting officers, and the firearms found during his arrest. (*Id*. at 2).

As set forth below, the Court is not persuaded by Fuller's arguments.

First, the Government has already provided Fuller with the identities of his arresting officers: the BWC footage disclosed during discovery is labeled with the arresting officers' names and badge numbers. (Doc. 35, Ex. 2, p. 1).

Moreover, Fuller has not convincingly shown that he is prejudiced by the absence of the ESLPD police report.[3] The report that *does* exist is by ISP Trooper Whalen who first identified Fuller's vehicle, followed it to the Mini Mart, called for backup, positioned his vehicle to block Fuller from escaping, and observed the entirety of Fuller's arrest by the arriving ESLPD officers. (Doc. 35, Ex. 12, p. 2). It is unclear to the Court, and Fuller has not explained, why Trooper Whalen's report does not suffice. Further, and more fundamentally, Fuller has not demonstrated what a report by the ESLPD would show that the BWC footage from those same officers does not.

---

[2] Fuller also states that ISP Trooper Whalen's footage was "unavailable until Fuller was in custody." (Doc. 28, p. 7). But Fuller has not explained why this footage (or its absence) is material, especially when body worn camera footage from the other officers has already been provided along with a written report by Trooper Whalen.

[3] The Government has consistently maintained that the ESLPD report Fuller demands does not exist. (Doc. 31, p. 3; Doc. 36, p. 4). "Neither Rule 16 nor *Brady*" demands that prosecutors "produce documents that they do not possess." *United States v. Mitrovich*, 95 F.4th 1064, 1069-70 (7th Cir. 2024).

Therefore, Fuller's claim of prejudice for lack of an ESLPD police report fails.

## II. Probable Cause for Arrest

Next, Fuller claims that there was no probable cause for his warrantless arrest. (Doc. 27). Specifically, he argues that: (1) the witnesses did not "positively identif[y]" Fuller as the shooter, that Officer Stambaugh "falsified a police report" to state otherwise, and thus GCPD did not have probable cause to order his arrest (*Id*. at p. 11); and (2) the officers at the scene of the arrest ("arresting officers") did not know what crime Fuller was wanted for and, as such, could not have had probable cause to arrest him (*Id*. at p. 9). He concludes that this constitutional violation demands the exclusion of evidence gathered during his arrest—including his statements and the firearms found in his vehicle.

The Court declines to exclude this evidence because both of Fuller's arguments that probable cause was lacking fail.

### *A. The Granite City Officers*

"The probable cause standard is a flexible, practical common-sense one which is met if the facts are sufficient to warrant a person of reasonable caution to believe that an offense has been or is being committed." *United States v. Hayes*, 236 F.3d 891, 894 (7th Cir. 2001) (citing *United States v. Colonia*, 870 F.2d 1319, 1323 (7th Cir.1989), *United States v. Evans*, 27 F.3d 1219, 1228 (7th Cir.1994)).

Fuller claims that the witnesses did not identify him as the shooter. Not so. The victims identified Fuller by name as early as during the initial 911 call. (Doc. 35, Ex. 7,

1:50). When the operator asked, "do you know who the person is who shot at you?," the victim responded, "yes, his name is Montez Fuller." (*Id.*). And while it is true that the victims did not see Fuller's face, they identified him as the shooter from the numerous threats he had been making, including "to shoot the house up." (*Id.* at Ex. 8, 15:20). The victims also showed GCPD Officer Stambaugh the threatening texts Fuller had sent.[4] (*Id.* at Ex. 9, 14:10).

A person of reasonable caution is unlikely to write off the shooting and the threatening texts as unrelated, especially when Fuller told witnesses that he was targeting the victims, stating "y'all good, ya'll good, I'ma kill them bitches." (*Id.* at Ex. 9, 19:35). Under these circumstances, a reasonable officer could conclude that Fuller was the shooter. Moreover, probable cause "does not demand any showing that such a belief [ultimately] be correct or more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983).

GCPD sufficiently established probable cause to arrest Fuller without a warrant.

*B. The Arresting Officers*

The officers at the scene, who were from both ESLPD and ISP, had probable cause to arrest Fuller. While Fuller is correct that the arresting officers stated that they were not aware of the details of his crime, this does not end the inquiry. (Doc. 35, Ex. 13, 10:46,

---

[4] Fuller claims that the police should have verified the victims' claim that these messages came from him. (Doc. 37, p. 4). However, it is "settled law . . . [that] an officer may base a determination of probable cause on information from the putative victim if the officer reasonably believes that the victim is telling the truth." *McBride v. Grice*, 576 F.3d 703, 707 (7th Cir. 2009). Fuller has not alleged, and the record does not support, that the GCPD were unreasonable in believing the victim's claim that the threatening messages were from Fuller.

11:45; Ex. 14, 8:48). "The collective knowledge doctrine permits an officer to stop, search, or arrest a suspect at the direction of another officer or police agency, even if the officer himself does not have firsthand knowledge of facts that amount to the necessary level of suspicion to permit the given action." *United States v. Williams*, 627 F.3d 247, 252 (7th Cir. 2010) (citing *United States v. Hensley*, 469 U.S. 221, 232–33 (1985)).

The collective knowledge doctrine demands the following:

> (1) the officer taking the action must act in objective reliance on the information received, (2) the officer providing the information—or the agency for which he works—must have facts supporting the level of suspicion required, and (3) the stop must be no more intrusive than would have been permissible for the officer requesting it.

*Id*. at 252-53.

Here, the Government has successfully demonstrated each element. First, Trooper Whalen—who first spotted Fuller's car and called ESLPD for assistance, culminating in Fuller's arrest—acted in objective reliance on the ISPERN notice. (Doc. 35, Ex. 13, 12:43, 34:13). The government asserts, and Fuller does not dispute, that ISPERN "is a commonplace police tool used to apprehend dangerous criminals." (Doc. 32, p. 11). The notice in this case included the make, model, and license plate[5] of Fuller's car, which is the information Trooper Whalen eventually used to spot the car in question. (Doc. 35, Ex. 9, 13:10; Ex. 13, 12:43). Second, as established above, GCPD had probable cause to

[5] Fuller repeatedly highlights the fact that the victim recited a license plate number to the 911 Operator that did not match the one on the car he had been driving. (Doc. 27, p. 10; Doc. 37, p. 3). He therefore suggests that the officers could not have identified him or his car solely based on this information. (*Id*.). What Fuller overlooks, however, is that one of the witnesses had taken a picture of his car at the scene, which included the correct license plate number, and the witness provided this to GCPD. (Doc. 35, Ex. 7, 4:10; Ex. 9, 5:39). GCPD also could have obtained the information from the CCTV footage provided in Doc. 35, Ex. 4.

publish the ISPERN notice for Fuller's arrest. Finally, Trooper Whalen and ESLPD's detention of Fuller were consistent with the conduct that would have been permissible for GCPD; Fuller does not argue otherwise.

As such, both of Fuller's claims for lack of probable cause fail.

**III. Search and Seizure**

Fuller next claims that the officers' search of his vehicle and seizure of his firearms was improper because they did not have a warrant and no exception to the warrant requirement applies. (Doc. 27, p. 14). Specifically, he claims that (1) there were no exigent circumstances because he "had ample opportunity to get rid of the evidence, [and] the police for some time knew of the probable cause," (*Id*. at 16); (2) the plain view doctrine does not apply because the vehicle's windows were tinted too dark to see firearms through and because the discovery of the firearms was not inadvertent (Doc. 37, pp. 4-5); and (3) the automobile exception also does not apply because "Coolidge vs [sic] New [H]ampshire[,] 403 U.S. 443 (1971) . . . kill[ed] the Automobile exception." (Doc. 37, p. 4-5).

The Court addresses this last claim first because a warrantless search need only be justified by a single exception, and the automobile exception suffices here. *See United States v. Mendez*, 103 F.4th 1303, 1306 (7th Cir. 2024) ("Ordinarily, in the absence of a warrant, a search is reasonable only if it falls within *a* specific exception to the warrant requirement.") (emphasis added) (cleaned up) (quoting *Riley v. California*, 573 U.S. 373, 382 (2014)).

Fuller is plainly wrong in claiming that *Coolidge* 'killed' the automobile exception. This exception is still very well and alive. *See e.g., United States v. Randle*, 185 F.4th 663 (7th Cir. 2026) (applying the automobile exception).

"Under the automobile exception, a police officer may search a car without a warrant if he has probable cause to believe the car contains contraband or evidence of a crime." *United States v. Markling*, 7 F.3d 1309, 1319 (7th Cir. 1993) (collecting cases). "Probable cause exists where[,] based on a totality of the circumstances[,] there is a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Zahursky*, 580 F.3d 515, 521 (2009) (cleaned up). In making this determination, an officer "may draw reasonable inferences from the facts" based on his "training and experience." *Id.*

Here, officers had probable cause to believe that Fuller's vehicle contained the firearm allegedly used in the shooting. Fuller shot at the victims from his car, and witnesses later saw him point a "big gun" from the same car. (Doc. 35, Ex. 8, 9:56; Ex. 9, 20:00). Those witnesses also saw him drive away, and because no firearm was found at the scene, the weapon was presumably still in his vehicle. (*Id.* at Ex. 9, 5:39). Fuller himself then supplied what may be the most telling fact. During a search of his person, he said, "that shit in the car." (*Id.* at Ex. 13, 00:15). From these facts, an officer could reasonably infer a fair probability that Fuller still had the firearm in his vehicle. Indeed, one ESLPD officer said before searching the car for firearms, "he [Fuller] said 32 in the car," and after opening the passenger door, said again, "I ain't see shit, he [Fuller] says it's in here though." (*Id.* at Ex. 14, 1:46, 2:15).

Fuller's claim that the warrantless search of his vehicle was unlawful fails.

## IV. Miranda Rights

Fuller also claims that "[a]t no point during Fullers [sic] arrest was he advised of his Miranda rights."[6] (Doc. 27, p. 6). However, *Miranda* warnings are only required when a suspect is "both in custody and subjected to interrogation." *United States v. Ambrose*, 668 F.3d 943, 954 (7th Cir. 2012) (citing *Miranda v. Arizona*, 384 U.S. 436, 444 (1966)).

Here, Fuller does not argue that the arresting officers interrogated him, nor does the record indicate that the officers did so. The statements he made during his arrest, such as "that shit in the car" and "they better hope I get life, they gonna regret putting me in these handcuffs," were made unprompted. (Doc. 35, Ex. 13, 00:15, 21:29). Therefore, this claim also fails.

## V. Collateral Challenge

Fuller next claims that his charge is improperly subject to enhancement under 18 U.S.C. § 924(e) because his bank robbery conviction was unlawful. (Doc. 28, p. 8). Specifically, Fuller alleges that the police extracted his name from his co-conspirator by offering her marijuana, leading to Fuller's arrest and conviction. (*Id*. at pp. 4-5). The Seventh Circuit has explicitly held, however, that § 924(e) does not permit a collateral challenge unless the defendant is alleging that the prior conviction was obtained after the

[6] Fuller repeatedly claims that the arresting officers failed to "cite[]" or "accuse[ him] of breaking any laws . . . during his arrest" (Doc. 27, pp. 17, 6). However, there is no established constitutional right to be informed of the reason for one's arrest at the time of arrest. *See Kladis v. Brezek*, 823 F.2d 1014, 1018 (7th Cir. 1987) ("We conclude that neither the Sixth Amendment nor the Fourth Amendment provide[] [a defendant] the right to be informed of the reason for his arrest.").

defendant was deprived of counsel. *See United States v. Arango-Montoya*, 61 F.3d 1331, 1336 (7th Cir. 1995) ("a prior conviction may be collaterally attacked at sentencing only where the defendant claims that he was deprived of counsel in violation of *Gideon*."). Fuller has not alleged that he was deprived of counsel for his bank robbery conviction. Therefore, his claim fails.

## VI. Vindictive Prosecution

Finally, Fuller claims that the prosecution's case against him is vindictive and in retaliation for his successful petition for compassionate release. (Doc. 28, p. 7). "To show vindictiveness, [the defendant] must affirmatively show through objective evidence that the prosecutorial conduct at issue was motivated by some form of prosecutorial animus, such as a personal stake in the outcome of the case or an attempt to seek self-vindication." *United States v. Baldwin*, 68 F.4th 1070, 1073 (7th Cir. 2023) (cleaned up).

Here, Fuller has presented no affirmative evidence that the prosecutor in this case, Steven Weinhoeft, bears animus towards him. Fuller's only charge against Weinhoeft is that Fuller tried calling the prosecutor and leaving messages to report the alleged police misconduct underlying his bank robbery conviction, but "to no avail." (Doc. 28, pp. 8-9). However, a prosecutor's failure to pick up the phone is not the type of persuasive, affirmative evidence that establishes prosecutorial animus. As such, this claim also fails.

## Conclusion

For these reasons, Fuller's Motion to Dismiss Indictment as Sanction (Doc. 26), Motion to Suppress Evidence Due to a [sic] Unlawful Search and Seizure (Doc. 27), and

Motion to Dismiss Indictment for Vindictive Prosecution (Doc. 28) are **DENIED**.

**IT IS SO ORDERED.**

**DATED: October 19, 2026**

**NANCY J. ROSENSTENGEL**
**United States District Judge**